**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: April 30, 2020**

*Craig A. Gargotta*

**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| LONE STAR BREWERY DEVELOPMENT, INC., | § | BANKRUPTCY NO. 20-50058-CAG |
| | § | |
| DEBTOR | § | |

ORDER APPROVING EMERGENCY MOTION FOR AUTHORIZATION TO SELL
PROPERTY OF THE ESTATE PURSUANT TO 11 U.S.C. § 363

Came on for consideration, the *Emergency Motion for Authorization to Sell Property of the Estate Pursuant to 11 U.S.C. § 363* (the "**Motion**").[1]  Based on the representations made in the Motion, and arguments of counsel, and evidence presented at the hearing on the Motion (the "**Sale Hearing**"), the Court finds that (1) proper and adequate notice of the Motion has been given and no further notice is necessary and such was reasonably calculated to provide all interested parties

---

[1] Capitalized terms unless otherwise defined herein shall have the meaning as ascribed to them in the Motion.

with timely and proper notice of the Sale and Sale Hearing; (2) it is in the best interest of the Debtor, its bankruptcy estate, and all creditors for the Debtor to enter into the Purchase and Sale Agreement ("**Agreement**") with GrayStreet Acquisitions, LLC ("**Buyer**"), a true and correct copy of which is attached hereto and incorporated herein, as **Exhibit 1**, and the *First Amendment to Agreement for Purchase and Sale of Real Property and Escrow Instructions*, a true and correct copy of which is attached hereto and incorporated herein, as **Exhibit 2,** to sell the Property, as such term is defined in the Agreement, to Buyer in accordance with the terms of the Agreement (the "**Sale**"), and (3) based upon the record herein, after due deliberation, good and sufficient cause exists for the granting of the Motion as set forth herein. All Ordered paragraphs shall constitute findings of fact and/or conclusions of law or vice versa.

**IT IS, THEREFORE, ORDERED** that the Motion is **GRANTED** as set forth herein.

**IT IS FURTHER ORDERED** that pursuant to 11 U.S.C. §363(f), the Debtor is hereby authorized to enter into the Agreement and proceed to consummate the sale of the Property to Buyer for a purchase price of $14,450,000.

**IT IS FURTHER ORDERED** that upon closing of the Sale, the Debtor is hereby authorized to pay (a) the allowed Secured Claim of BI 28, LLC, (b) the 2019 property taxes (if any), (c) the pro-rated 2020 property taxes attributable to the Debtor, (d) the commission owed to JLL from the sale of the Property, (e) Real Estate Lien securing cost of dangerous structure demolition in the amount of $4,818.00, in favor of the City of San Antonio, filed April 3, 2019 and recorded in Document Number 20190059533, Official Public Records, Bexar County, Texas, (f) Real Estate Lien securing cost for securing unoccupied building in the amount of $1,623.00, in favor of the City of San Antonio, filed January 9, 2020 and recorded in Document Number 20200005707, Official Public Records, Bexar County, Texas and (g) all other closing costs.

**IT IS FURTHER ORDERED** that the ad valorem taxes for year 2020 pertaining to the subject properties shall be prorated in accordance with the Purchase and Sale Agreement for the Property and, if not paid in full at closing, shall become the responsibility of the Purchaser and the 2020 ad valorem tax lien shall be retained against the subject properties until said taxes are paid in full.

**IT IS FURTHER ORDERED** that under section 363(m) of the Bankruptcy Code, Buyer is a good faith purchaser. The Buyer is not an "insider" or "affiliate" or the Debtor as those terms are defined in the Bankruptcy Code.  Neither the Debtor nor the Buyer have engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code. The Buyer is entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

**IT IS FURTHER ORDERED**, that the consideration provided by the Buyer pursuant to the Agreement  (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Property, (iii) will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, and (iv) constitutes reasonable equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  The Debtor's determination that the Agreement constitutes the highest or otherwise best offer for the Property constitutes a valid and sound exercise of the Debtor's business judgment.  Approval of the Motion and Agreement, and the consummation of the transactions contemplated thereby, is in the best interests of the Debtor, its estate, creditors and other parties-in-interest including the equity owner(s) of the Debtor.

**IT IS FURTHER ORDERED** that the Debtor has good and marketable title to the Property and is the lawful owner of the Property.  Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Property to the Buyer will be, as of the closing of the Sale (the "**Closing Date**"), a legal, valid and effective transfer of the Property, which transfer vests or will vest the Buyer with all right, title, and interest of the Debtor to the Property free and clear of (i) all liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims and encumbrances (including any right of first offer or refusal regarding or option to purchase any real property) relating to, accruing or arising any time prior to the Closing Date (collectively, the "**Liens**") and (ii) all debts arising under, relating to or in connection with any act of the Debtor or claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligation, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of this case, and whether imposed by agreement, understanding, law, equity or otherwise. The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtor may sell the Property free and clear of any claim or interest in the Property.

**IT  IS FURTHER ORDERED**, that the Debtor may sell the Property free and clear of all Liens, claims and other interests of any kind or nature whatsoever against the Debtor, its estate or the Property because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens and claims against the Debtor, its estate, or the Property, who did not object or who withdrew their objections to the Sale or the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Property to the Buyer, and such transfer shall (a) constitute a legal, valid, binding

and effective transfer of the Property, (b) vest the Buyer with title to the Property and (c) upon the Debtor's receipt of the Purchase Price, be free and clear of all Liens, claims and other interests of any kind or nature whatsoever, including but not limited to, successor or successor-in-interest liability and Claims, with such Liens, including mechanics, materialmen and subcontractor Liens and rights to receive payment of trust funds, claims and other interests to attach to the proceeds of the Sale in the order of their priority, with the same validity, force and effect which they now have as against the Property.  Upon the closing of the Sale, the Buyer shall have good, marketable and valid title to and full possession of the Property, free and clear of any Liens, claims or interests, except as expressly provided in the Agreement. The provisions of this Order authorizing the Sale of the Property free and clear of Liens, claims and other interests of any kinds or nature whatsoever shall be self-executing, and neither the Debtor nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Order, other than the documents referenced in the Agreement.

**IT IS FURTHER ORDERED** that good and sufficient reasons for approval of the Agreement and the Sale of the Property have been articulated, and the Agreement and the Sale are hereby approved in all things.  The relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors and other parties-in-interest, including the equity owners of the Debtor.  The Debtor has demonstrated (i) good, sufficient and sound business purposes and justifications for approving the Agreement, and (ii) compelling circumstances for the Sale outside of (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code and (b) a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Buyer  is necessary and appropriate to maximize the value of the Debtor's estate and the Sale

will provide the means for the Debtor to maximize distributions to its creditors and equity owners. The Sale does not constitute a sub rosa chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidating plan of reorganization for the Debtor.

**IT IS FURTHER ORDERED** that to the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Property sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtor's chapter 11 case or the consummation of the Sale contemplated by the Agreement. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale contemplated by the Agreement and this Order.

**IT IS FURTHER ORDERED** that pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized and empowered to take any and all actions necessary or appropriate to (i) consummate to Sale to Buyer pursuant to and in accordance with the terms and conditions of the Agreement, (ii) close the Sale as contemplated by the Agreement and this Order, and (iii) execute and deliver, perform under, consummate, implement and fully close the Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the same and the Sale.

**IT IS FURTHER ORDERED** that except as expressly provided for in this Order or the Agreement, the Buyer shall not have any liability or other obligation of the Debtor arising under or related to the Property, and the Buyer is not a "successor" to the Debtor or its estate by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any

– 6 –

way be responsible for any liability or obligation of any of the Debtor and/or its estate under any theory of law or equity. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Agreement, the Buyer shall not be liable for any claims against the Debtor or any of its respective predecessors or affiliates, and the Buyer shall have no successor, transferee or vicarious liabilities of any kind or character.

**IT IS FURTHER ORDERED** that this Order shall be binding in all respects upon (a) the Debtor, (b) its estate, (c) all creditors of, and holders of equity interests in, the Debtor, (d) all holders or Liens, claims or other interests (whether known or unknown) in, against or on all or any portion of the Property, (e) the Buyer and all successors and assigns of the Buyer, (f) the Property and (g) any trustees, if any, subsequently appointed in the Debtor's chapter 11 case or upon a conversion of this case to a case under chapter 7 of the Bankruptcy Code.

**IT IS FURTHER ORDERED** that this Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, Federal Rule of Civil Procedure 62(a) or otherwise.  The Debtor and the Buyer are authorized to close the Sale immediately upon entry of this Order or at such later time as provided in the Agreement. The 14 day stay under Rule 6004(h) is hereby waived, such that Debtor may immediately proceed with selling the   Property in accordance with the Agreement.

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

# # #

**Submitted by:**

Randall A. Pulman

– 7 –

Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Thomas Rice
Texas State Bar No. 24025613
trice@pulmanlaw.com
Amber L. Fly
Texas State Bar No. 24101761
afly@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 (Telephone)
(210) 892-1610 (Facsimile)

**ATTORNEYS FOR THE DEBTOR**

# EXHIBIT 1

{EXHIBIT Letters}

## AGREEMENT FOR PURCHASE AND SALE
## OF REAL PROPERTY AND ESCROW INSTRUCTIONS

THIS AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY AND ESCROW INSTRUCTIONS (**"Agreement"**) between Lone Star Brewery Development, Inc., and the parties that are signatory hereto as Seller (collectively, **"Seller"**), and GrayStreet Acquisitions, LLC, a Texas limited liability company, or its assigns (**"Buyer"**), is made and entered into as of the Effective Date (as defined below).

<u>Recitals</u>

A.       Seller owns certain tracts of real property consisting of approximately thirty-two (32) acres of land and a complex of historic structures formerly housing the Lone Star Brewery just south of downtown San Antonio, Texas, more specifically described in **Exhibit A** attached hereto and incorporated herein for all purposes (the "**Land**").

B.       Subject to the terms and conditions set forth below, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Property (as hereinafter defined).

C.       For purposes of this Agreement, the **"Effective Date"** shall be the date upon which the Title Company acknowledges receipt of a fully executed original of this Agreement executed by both Seller and Buyer.

<u>Agreement</u>

NOW, THEREFORE, in consideration of the mutual covenants, promises and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.       <u>Purchase and Sale</u>.  The above "**Recitals**" are hereby incorporated into this Agreement as if fully set forth herein.  Seller hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from Seller, the Property on the terms and conditions set forth herein.  The purchase and sale includes all of the following (hereinafter sometimes collectively referred to as the **"Property"**):

1.1.       The Land described on **Exhibit A** attached hereto and incorporated herein for all purposes, together with all structures, buildings, improvements and fixtures affixed or attached thereto (the "**Improvements**") and all easements and rights appurtenant thereto, including, without limitation: (i) all easements, privileges, tenements, hereditaments, appurtenances and rights belonging or in any way appurtenant to such real property; (ii) any strip or gore or any land lying in the bed of any street, road, alley or right-of-way, open or closed, adjacent to or abutting such real property (and all of Seller's right, title, and interest in and to any awards made, or to be made in lieu thereof, and in and to any unpaid awards for damage to the Land by reason of a change of grade thereof); and (iii) any and all of Seller's right, title, and interest in and to, the extent transferable, air rights, subsurface rights, development rights, and water rights permitting to such real property, utility capacity, governmental approvals, licenses, and permits (including all water,

sewer, and drainage capacity currently held by Seller) (all of the foregoing being collectively referred to herein as the **"Real Property"**);

1.2. All of Seller's right, title and interest, if any, in any items of personal property of every kind and character (the **"Personalty"**) owned by Seller and located in or used in connection with the Real Property and the operation thereof, if any;

1.3. To the extent transferable, all of Seller's right, title and interest, if any, in any and all plans and specifications, architectural and engineering drawings, surveys, environmental studies, soil studies, substrata studies of the Property;

1.4. To the extent transferable, all of Seller's right, title, and interest, if any, in and to all warranties, guaranties, and trade names relating to the Land, the Improvements, and the Personalty and the operation thereof;

1.5. To the extent transferable, any and all building permits, certificates of occupancy and other certificates, permits, consents, authorizations, variances or waivers, dedications, subdivision maps, licenses and approvals from any governmental or quasi-governmental agency, department, board, commission, bureau or other entity or instrumentality relating to the Property (collectively, the **"Permits"**);

1.6. All of Seller's right, title, and interest in and to any oil, gas, and other minerals in, under, and that may be produced from the Land, regardless of whether or not the minerals are considered part of the surface estate or part of the mineral estate; and

1.7. All other rights, privileges, and appurtenances owned by Seller that relate in any way to the above-described properties.

For the avoidance of doubt, any and all service contracts entered into by Seller relating to the operation of the Property as of the Effective Date or entered into by Seller in accordance with this Agreement prior to Closing, including Seller's insurance and Seller's asset and property management agreements (collectively, the **"Contracts"**), shall all be terminated at Closing and not assumed by Buyer and shall not comprise a part of the Property. Seller shall, at Closing, provide to Buyer evidence of notices of termination with regard to the Contracts.

2. <u>Purchase Price</u>. Subject to the charges, prorations and other adjustments set forth in this Agreement, the purchase price for the Property shall be Seventeen Million Two Hundred Fifty Thousand and No/100 Dollars ($17,250,000.00) (**"Purchase Price"**), payable as follows:

2.1. <u>Deposit</u>. Within three (3) Business Days after the Effective Date, Buyer shall deposit into Escrow (as hereinafter defined) the amount of Five Hundred Seventeen Thousand Seven Hundred and No/100 Dollars ($517,700.00) (together with any interest thereon, the **"Deposit"**), in the form of a wire transfer payable to Chicago Title Insurance Company, Attn: Douglas W. Becker, 15727 Anthem Parkway, Suite 210, San Antonio, Tx, 78249 (**"Escrow Holder"**). Escrow Holder shall place the Deposit into an interest-bearing money market account at a bank or other financial institution reasonably satisfactory to Buyer; provided, however, that the Escrow Holder shall invest the Deposit only in a manner that will allow the Escrow Holder to

disburse the Deposit on one (1) days' notice.  All interest or other earnings on the Deposit shall be and remain Buyer's sole property.  If this Agreement is consummated, then the Deposit must be applied against the total cash Purchase Price to be paid by Buyer at the Closing.  In the event Buyer does not deliver a Termination Notice, the Deposit is non-refundable to Buyer, except as expressly provided otherwise herein.  In the event Buyer delivers a Termination Notice pursuant to any express termination right set forth herein, the Escrow Holder shall immediately release the Deposit to Buyer, without the necessity of any further written authorization to release the Deposit from Seller.

  2.2. <u>Deposit of the Balance of the Purchase Price at Closing</u>.  At Closing, in accordance with <u>Section 6.3.2</u> below, Buyer shall deposit into Escrow the balance of the Purchase Price (subject to adjustments and prorations as set forth herein) by wire transfer payable to Escrow Holder.

  In addition, Seller acknowledges receipt of the sum of One Hundred and No/100 Dollars ($100.00) cash (the "**Independent Consideration**") from Buyer, as independent consideration for Seller's execution of this Agreement.  The parties have bargained for that amount as consideration for Buyer's exclusive and unrestricted option to purchase the Property pursuant to this Agreement and for Seller's execution of this Agreement, in addition to other consideration described in this Agreement.  If this Agreement is consummated, then the Independent Consideration will be applied toward the cash portion of the Purchase Price paid by Buyer.  If this Agreement is terminated because of a default by Seller, then Seller must immediately return the Independent Consideration to Buyer.  If this Agreement is terminated for any reason other than a default by Seller, then Seller may retain the Independent Consideration.

  Seller acknowledges and agrees that (i) Seller shall cause Buyer's good faith bidder deposit in the amount of One Hundred Thousand and No/100 Dollars (the "**Good Faith Bidder Deposit**"), which was previously deposited with Seller's counsel, Pulman Capuccio & Pullen, LLP, to be returned to Buyer on the Effective Date, and (ii) the Good Faith Bidder Deposit shall not comprise part of the Deposit.

3. <u>Title to Property</u>.  Within ten (10) days of the Effective Date, Seller shall provide to Buyer: (i) a current preliminary title report or title commitment (the **"Title Report"**) for the issuance of an extended coverage owner's T-1 policy of title insurance, together with such endorsements as may be commercially available and reasonably requested by Buyer, underwritten by Fidelity National Title or its affiliates, including Chicago Title Insurance Company (the **"Title Policy"**), to Buyer from Escrow Holder (sometimes referred to herein as the **"Title Company"**), together with legible copies of all documents constituting exceptions to the title as reflected in the Title Report (collectively with such Title Report being referred to hereinafter as the **"Title Documents"**); and (ii) an existing survey of the Real Property (the **"Existing Survey"**) to the extent there is one in Seller's possession, at Seller's expense; and (iii) copies of all documents in Seller's possession pertaining to the development, ownership, or operation of the Property (collectively, the "**Due Diligence Items**"), including but not limited to, the specific items listed on **<u>Exhibit B</u>** attached hereto and made a part hereof for all purposes. On or before Closing, Seller shall deliver to Buyer and the Title Company a T-47 Affidavit, certifying that there have been no changes to the Property since the date of the Existing Survey, in a form acceptable to the Title Company sufficient to permit the Title Company to issue the "shortages in area" endorsement.

Notwithstanding the foregoing, if there is no Existing Survey, or, if Buyer otherwise elects in Buyer's sole discretion, at Buyer's expense, to obtain a new survey, then Buyer may cause a new 'as-built' survey of the Real Property to be performed during the Inspection Period (such revised or new survey being referred to herein as the **"Survey"**). Subject to Buyer's and Seller's reasonable approval as to the accuracy of the description, as and when the metes and bounds field note description from the Survey become available, the same be automatically substituted for the attached **Exhibit A** without the need for an amendment to this Agreement and shall be used in the Deed and Title Policy.

If the Title Documents, Existing Survey or Survey, or Due Diligence Items reflect or disclose any defect, exception or other matter affecting the Property that is unacceptable to Buyer, Buyer shall provide Seller with written notice to Seller thereof at least seven (7) days prior to the expiration of the Inspection Period (whether one or more, **"Buyer's Objections"**); provided, however, that Buyer shall not be required to object to any Mandatory Title Cure Items (as defined below) and Seller shall be required to cure all Mandatory Title Cure Items. In its sole discretion, upon written notice to Buyer, Seller may elect to cure or remove Buyer's Objections, and, if Seller elects to cure or remove Buyer's Objections, it shall be a condition precedent to Buyer's obligation to acquire the Property that Seller cures Buyer's Objections prior to Closing. Unless Seller provides written notice to Buyer within five (5) Business Days of receiving Buyer's Objections that Seller intends to cure or remove Buyer's Objections, Seller shall be deemed to have elected not to cure or remove Buyer's Objections (other than the Mandatory Title Cure Items, which Seller shall be required to cure), and Buyer shall be entitled, as Buyer's sole and exclusive remedy, either to: (i) terminate this Agreement and obtain a refund of the Deposit by providing written notice of termination to Seller prior to the expiration of the Inspection Period (whereupon Seller shall retain the Independent Consideration, Buyer shall return the Due Diligence Items, and neither Seller nor Buyer shall have any continuing rights or obligations hereunder other than Buyer's indemnity of Seller as provided in Section 4.3 below); or (ii) waive Buyer's Objections and close this transaction as otherwise contemplated herein. If Buyer fails to terminate this Agreement during the Inspection Period, all matters described in the Title Report and the Title Documents and/or shown on the Existing Survey, Survey, shall be deemed **"Permitted Exceptions"** except for Mandatory Title Cure Items. Notwithstanding anything herein to the contrary, under no circumstances shall Buyer be required to object to monetary liens for indebtedness, judgments, liens, mechanic liens or other monetary encumbrances or other matters shown on Schedule "C" of the Title Report (except for the lien or liens for taxes not yet due and payable), recorded documents pertaining to the tenancy in common ownership of Seller including any advisory or management agreement, any matters related to the bankruptcy proceedings affecting the Property, and any other matters Seller has agreed to cure in writing (collectively, the **"Mandatory Title Cure Items"**), which shall be released or satisfied by Seller at its expense prior to Closing and shall in no event be deemed Permitted Exceptions. To the extent the same is sufficient for the Title Company to issue to Buyer the Title Policy clear of any exceptions relating to bankruptcy proceedings or any debtor relief laws, Seller may satisfy the Mandatory Title Cure Items by obtaining an order from the Bankruptcy Court that any and all liens, claims, and interests attach only to the sale proceeds from the sale, rather than the Property, pursuant to 11 U.S.C. §365. Notwithstanding anything to the contrary in this Agreement, Seller shall have no obligation to cure any of Buyer's Objections other than the Mandatory Title Cure Items.

After the Effective Date, Seller will not intentionally or deliberately place on the Property any encumbrance (references to "encumbrance" include any lien, encumbrance, or other exception to title). Notwithstanding anything in this Agreement to the contrary, if between the delivery of Buyer's Objections and the Closing Date, Buyer receives notice of any additional recorded liens, encumbrances, or other matters that are not reflected in the initial Title Documents, Existing Survey, or Survey (if applicable) (collectively, "**New Matters**"), Buyer may submit additional Buyer's Objections to Seller objecting to any such New Matters within five (5) Business Days after its receipt of notice of any such New Matters. Seller shall use commercially reasonable efforts to remedy Buyer's objections to any New Matters. Seller shall notify Buyer in writing within three (3) Business Days after receipt of any Buyer's Objections covering any New Matters whether Seller elects to attempt to remove or otherwise cure the objection to such New Matters (the "**New Matter Response**"). If Seller provides such New Matter Response, it shall be a condition precedent to Buyer's obligation to acquire the Property that Seller, at its sole cost and expense, shall be obligated to use reasonable efforts to remove or otherwise cure the objections set forth in such notice in a manner reasonably acceptable to Buyer on or before the Closing. If Seller (A) is unable or unwilling to remove or remedy such objections in a manner reasonably acceptable to Buyer on or before the Closing; (B) fails to timely deliver such New Matter Response to Buyer; or (C) notifies Buyer that Seller has elected not to remove or otherwise cure any objections to New Matters (other than the Mandatory Title Cure Items, which Seller shall be required to cure), then Buyer shall be entitled to (X) terminate this Agreement by written notice to Seller (whereupon the Deposit shall immediately be returned to Buyer, Seller shall retain the Independent Consideration, Buyer shall return the Due Diligence Items, and neither Seller nor Buyer shall have any continuing rights or obligations hereunder other than Buyer's indemnity of Seller as provided in Section 4.3 below); or (Y) accept the title that Seller can deliver and proceed to the Closing. The Closing shall be extended to the extent necessary to allow for Buyer's objection to New Matters, Seller's cure of objections to New Matters (to the extent Seller is required to do so under this Agreement), and Buyer's right to terminate this Agreement with respect to Seller's failure to cure objections to New Matters, within the periods set forth in this Section.

4. <u>Inspections</u>.

4.1 Buyer shall have a non-exclusive license to enter and conduct such feasibility, engineering, market, economic, environmental, physical and any other studies of the Property that Buyer may deem necessary or advisable, in Buyer's sole discretion (collectively, the **"Inspections"**) during the term of this Agreement, on the terms set forth in this <u>Section 4</u>. Notwithstanding the foregoing, Buyer shall not conduct invasive testing (other than "Phase II" environmental testing or geotechnical studies, which is hereby expressly permitted) without Seller's prior written consent, which consent shall not be unreasonably withheld. Buyer must arrange all Inspections requiring physical entry onto the Property with Seller at least one (1) day in advance of any Inspections, which arrangements may be made orally or via email with Seller.

At any time prior to Closing, Buyer shall be entitled to file applications with the City of San Antonio, County of Bexar and other applicable governing authorities to plat or replat and zone or rezone the Property in a manner acceptable to Buyer for its planned development, and to obtain all development commitments, entitlements, permits and approvals, or incentives as may be deemed necessary by Buyer in connection with its contemplated use and development of the Property, if any (all of the foregoing commitments, entitlements, permits, and approvals and

incentives set forth hereinabove being collectively referred to herein as the "**Approvals**"), and Seller agrees to cooperate with Buyer and execute such documents as may be reasonably required in connection with the Approvals. Notwithstanding the foregoing, under no circumstances shall any such Approvals impose any burden or be binding upon the Property prior to Closing, nor shall the same impose any cost or liability on Seller.

4.2 Buyer agrees to remove all debris and trash resulting from the Inspections and to remove all equipment and other materials used by Buyer or its agents within a reasonable period after the activity for which such equipment and other materials are used is completed. Buyer and its agents shall take all reasonably appropriate measures for the safety of persons and property on the Property related to the Inspections and shall comply with all applicable legal requirements. Buyer shall restore any damage to the Property resulting from the Inspections, including, but not limited to, repair of surface openings resulting from tests. In the event Buyer terminates this Agreement during the Inspection Period, then, upon Seller's written request, Buyer shall promptly provide to Seller a copy of Buyer's Reports (as hereinafter defined), subject to reimbursement as set forth in Section 5.2. Buyer agrees to promptly discharge any liens that may be imposed against the Property as a result of the Inspections.

4.3 Buyer shall indemnify, save and hold Seller and Seller's officers, agents, employees, directors, trustees, invitees, successors and assigns (collectively "**Indemnitees**"), harmless against all losses, costs, expenses, liabilities, claims, litigation, demands, proceedings and damages (including but not limited to reasonable attorney's fees) suffered or incurred by Seller or any such Indemnitees, arising out of and limited to the Inspections; provided, however, that the foregoing indemnity shall exclude and Buyer shall not incur any liability due to (i) its discovery, without exacerbation, of the condition of any "hazardous substances", any unfavorable test result or the discovery of any existing conditions of or affecting the Property, including, without limitation, any loss resulting from any decrease in the fair market value of all or any portion of the Property or the inability of Seller to market the Property due to any such discovery or unfavorable test result (so long as Buyer does not exacerbate any such condition), or (ii) any such loss, damage or claim if and to the extent caused by the sole negligence, gross negligence or reckless or willful misconduct of Seller or its respective agents, contractors, auditors, engineers, attorneys, employees, consultants and other representatives.

4.4 To the extent Buyer intends to physically access the Property, Buyer shall maintain, and shall require any of its subcontractors and agents that intend to physically access the Property to maintain, insurance, as follows: Comprehensive General Liability or Commercial General Liability Insurance, with limits of not less than One Million Dollars ($1,000,000.00) combined single limit per occurrence and not less than Two Million Dollars ($2,000,000.00) on a general aggregate basis, for bodily injury, death and property damage. Each policy of insurance required hereunder shall name Seller as an additional insured. Further, each such policy of insurance shall state that such policy is primary and noncontributing with any insurance carried by Seller. A certificate, together with any endorsements to the policy required to evidence the coverage which is to be obtained hereunder, shall be delivered to Seller prior to entry on the Property. Any policies required by the provisions of this Section 4.4 may be made a part of a blanket policy of insurance with a "per project, per location endorsement" so long as such blanket policy contains all of the

provisions required herein and does not reduce the coverage, impair the rights of the other party to this Agreement or negate the requirements of this Agreement.

4.5     During the course of its performance of the Inspections, Buyer will acquire knowledge concerning the Property and Seller, and knowledge of other matters of a sensitive business nature, and Seller will acquire knowledge concerning Buyer, including the existence of this possible purchase/sale transaction, the terms of sale (including the Purchase Price) and other matters of a sensitive and confidential nature (collectively, **"Privileged Information"**).  Except as described below, neither Buyer, nor Seller, nor Brokers, nor their agents shall disclose to any third party, publicize or suffer or permit any of their respective employees to so disclose or publicize any such Privileged Information, other than to directors, officers, employees, affiliates, agents, attorneys, accountants, auditors, prospective lenders, consultants, and others providing professional services, prospective investors or prospective purchasers and the Title Company, as necessary for Buyer's inspection and analysis of the Property.  In the event that any party believes in good faith that it is required by any legal requirement to disclose any such Privileged Information, then such party shall promptly notify the other parties of such belief and the reasons for such belief.  If within ten (10) days after receipt of such notice, such party advises the party that sent the notice that it shall itself disclose the information, then such party shall not make such disclosure (unless either such party reasonably believes that it must disclose such information by law).  If such party reasonably believes that such disclosure is required to be made in less than the ten (10) day period, then the notice to the other party shall so state and the party's time to respond will be reduced accordingly.  In no event shall Privileged Information include: (a) information which is or becomes generally available to the public other than as a result of a disclosure by a party; or (b) was known by a party on a non-confidential basis prior to its disclosure to a party.

4.6     The obligations described in Sections 4.3 and 4.5 shall survive the Closing or any earlier termination of this Agreement for a term of one (1) year.

5.     Approval.

5.1.     Buyer shall have until 5:00 p.m. San Antonio, Texas time on May 1, 2020 (the **"Inspection Period"**) to review and approve or disapprove the Due Diligence Items, perform the Inspections and examine the condition of the Property.  If the Due Diligence Items or the Inspections show any fact, matter or condition to exist with respect to the Property that is unacceptable to Buyer, in Buyer's sole discretion, or if Buyer determines for any reason, or no reason at all, that Buyer does not desire to consummate the purchase and sale transaction contemplated by this Agreement, then Buyer shall be entitled, as its sole and exclusive remedy, to terminate this Agreement by providing written notice to Seller and Escrow Holder on or prior to the expiration of the Inspection Period (a **"Termination Notice"**), in which event Buyer shall receive back the Deposit, Seller shall retain the Independent Consideration, and neither Seller nor Buyer shall have any continuing rights or obligations hereunder other than Buyer's indemnity of Seller as provided in Section 4.3 above.  If Buyer fails to send a timely Termination Notice, the Due Diligence Items, Inspections and condition of the Property shall be deemed approved by Buyer; Buyer shall be deemed to have waived its right to terminate this Agreement pursuant to this Section 5.1; and the parties shall be obligated to close the transaction contemplated hereby,

except as may otherwise be provided herein, and the Deposit shall become nonrefundable to Buyer (except in the event of a Seller default hereunder and as otherwise expressly provided herein).

5.2.     Notwithstanding anything to the contrary contained in this Agreement, Buyer hereby agrees that, in the event this Agreement is terminated for any reason (other than a default by Seller), Buyer shall promptly, and at its sole expense, return to Seller all Due Diligence Items which have been delivered to Buyer no later than ten (10) days after the date that this Agreement is terminated; and, upon Seller's written request and payment to Buyer of fifty percent (50%) of the costs incurred by Buyer of Buyer's Reports (defined below), deliver to Seller copies of the following reports, to the extent Buyer has in fact obtained the same: (1) the Title Report; (2) the Survey; (3) a current Phase I environmental site assessment report; (4) a zoning report; and (5) a current property condition report ("**Buyer's Reports**"), subject to restrictions on Buyer's ability to make any such materials available to Seller that are imposed in any agreement with a third party consultant preparing any such reports or materials; provided, however, that delivery of Buyer's Reports by Buyer shall be made on an AS-IS basis, without warranty or representation whatsoever, express or implied, including, without limitation, any warranty or representation as to ownership, accuracy, adequacy or completeness thereof or otherwise. Buyer shall cooperate with Seller at no expense to Buyer in order to obtain a waiver of any such restrictions.

6.     Escrow.

6.1     Instructions. The purchase and sale of the Property shall be consummated through an escrow (**"Escrow"**) to be opened with Escrow Holder. This Agreement shall be considered as the escrow instructions between the parties, with such further instructions as Escrow Holder may reasonably require in order to clarify its duties and responsibilities. If Escrow Holder shall reasonably require further escrow instructions, Escrow Holder may prepare such instructions on its usual form. Such reasonable further instructions shall be promptly signed by Buyer and Seller and returned to Escrow Holder within three (3) Business Days of receipt thereof. In the event of any conflict between the terms and conditions of this Agreement and such further instructions, the terms and conditions of this Agreement shall control.

6.2     Closing. Escrow shall close (the **"Closing"**) at the offices of the Title Company on the later of (i) the seventh (7th) day following the expiration of the Inspection Period, or (ii) the fifteenth (15) day following the date of the Bankruptcy Approval (as defined below) (the **"Closing Date"**).

6.3     Buyer Required to Deliver. Buyer shall deliver to Escrow, on or before the Closing Date except as specified in Section 6.3.1 the following:

6.3.1.   Within three (3) Business Days after the Effective Date, the Deposit;

6.3.2   On or before 1:00 p.m. Central Standard Time, as applicable, on the Closing Date, the balance of the Purchase Price (less the Deposit), subject to the closing adjustments, credits and prorations contemplated hereby; provided, however, that, notwithstanding anything to the contrary in this Agreement, if Buyer fails to make such delivery by 1:00 p.m. Central Standard Time, as applicable, but nevertheless makes such delivery on the Closing Date, then the same shall

not be a default hereunder and prorations shall be recalculated in accordance with <u>Section 6.7</u> below and for purposes of prorations, the Closing Date shall be deemed the next Business Day;

6.3.3    On or before the Closing Date, such other documents as Title Company may reasonably require from Buyer in order to issue the Title Policy;

6.3.4    Two (2) original counterparts executed by Buyer of the Closing Statement (as defined in <u>Section 6.7.2</u> below); provided, however that such executed Closing Statement may be transmitted by facsimile and/or e-mail so long as two (2) original counterparts are deposited with Federal Express or other nationally recognized overnight delivery service on the Closing Date for delivery to Escrow Holder the next Business Day, if required by Escrow Holder; and

6.3.5    All documents required by Buyer's Lender, if any (as hereinafter defined), its counsel or the Escrow Holder.

6.4.    <u>Seller Required to Deliver</u>.  On or before the Closing Date, Seller shall deliver to Escrow (unless otherwise noted) the following:

6.4.1.  A duly executed and acknowledged special warranty deed, conveying indefeasible fee simple title to the Property in favor of Buyer or Buyer's nominee (the **"Deed"**), free and clear of all liens and encumbrances except for the Permitted Exceptions, if any, in the form attached hereto as **Exhibit C** and incorporated herein for all purposes;

6.4.2.  An executed certificate of non-foreign status, in the form attached hereto as **Exhibit D** and incorporated herein for all purposes;

6.4.3.  Two (2) original counterparts executed by Seller of the Bill of Sale and Assignment and Assumption Agreement, in the form attached hereto as **Exhibit E** and incorporated herein for all purposes;

6.4.4.  Two (2) original counterparts executed by Seller of the Closing Statement; provided, however, that such executed Closing Statement may be transmitted by facsimile and/or e-mail so long as two (2) original counterparts are deposited with Federal Express or other nationally recognized overnight delivery service on the Closing Date for delivery to Escrow Holder the next Business Day, if required by Escrow Holder;

6.4.5.  Such other documents as Title Company may reasonably require from Seller in order to issue the Title Policy, including, without limitation, an Affidavit and Agreement Relating to Unpaid Bills or Claims in a form satisfactory to the Title Company and Buyer, certifying that there are no unpaid bills or claims relating to the Property as of the Closing Date except as specified and indemnifying Buyer with respect to bills or claims unpaid as of the Closing Date;

6.4.6.  Seller shall make available at the Property, all keys to all buildings and other improvements located on the Property, all keying charts related to the Property, combinations to any safes thereon, and security devices therein in Seller's possession;

6.4.7.  Seller shall make available at the Property all records and files relating to the management or operation of the Property; and

6.4.8  Seller shall deliver to Buyer possession of the Property, subject only to the Permitted Exceptions.

6.5.  <u>Buyer's Costs</u>.  Buyer shall be responsible for payment of Buyer's Reports and any other costs of Buyer's investigations if the Closing does not occur.  In the event the Closing occurs, Buyer shall pay the following:

6.5.1.  Any closing costs in connection with the financing of the purchase of the Property;

6.5.2.  The costs of Buyer's investigations, including Buyer's Reports;

6.5.3.  Survey (if requested by Buyer);

6.5.4.  One-half of all of Escrow Holder's fees, costs and expenses;

6.5.5.  Recording Fees;

6.5.6.  Title Policy Endorsements; and

6.5.7.  Buyer's attorneys' fees.

6.6.  <u>Seller's Costs</u>.  Seller shall pay the following:

6.6.1.  One-half of all of Escrow Holder's fees, costs and expenses;

6.6.2.  Title Company's basic premium for the TLTA Title Policy;

6.6.3.  All documentary or other transfer taxes applicable to the sale;

6.6.4.  The commission payable to Brokers; and

6.6.5.  Costs of Seller's counsel.

6.7.  <u>Prorations</u>.

6.7.1.  <u>Items to be Prorated</u>.  The following shall be prorated between Seller and Buyer as of the Closing Date with Buyer being deemed the owner of the Property as of the Closing Date:

6.7.1.1.  <u>Taxes and Assessments</u>.  Taxes shall be prorated as follows: All non-delinquent real property taxes, assessments and other governmental impositions of any kind or nature, including, without limitation, any special assessments or similar charges (collectively,

**"Taxes"**), which relate to the tax year within which the Closing occurs shall be pro-rated based upon the actual number of days in the tax year. The proration for Taxes shall be based upon the most recently issued tax bill for the Property and shall be calculated based upon the maximum early payment discount available. Upon the Closing, Buyer shall be responsible for Taxes payable from and after the Closing. Upon the Closing, Seller shall be responsible for Taxes payable with respect to the period prior to the Closing. In no event shall Seller be charged with or be responsible for any increase in Taxes for any period following Closing resulting from the sale of the Property to Buyer in this transaction or from any improvements made or leases entered into after the Closing; provided, however, that Seller shall be responsible for and shall indemnify Buyer against any and all rollback taxes and other taxes assessed from and after Closing which are attributable to the period prior to Closing due to a change in land use, ownership or otherwise. In the event rollback taxes will be assessed, Seller shall pay or escrow with the Title Company for payment to the applicable taxing authority an amount determined by the Title Company to be sufficient for payment in full of the rollback taxes assuming a change in use of the Property by Buyer at Closing. With respect to all periods for which Seller has paid Taxes Seller hereby reserves the right to institute or continue any proceeding or proceedings for the reduction of the assessed valuation of the Property, and, in its sole discretion, to settle the same, as long the same does not encumber the Property or result in any lien on the Property and is paid under protest, bonded or otherwise secured by Seller. As long the same does not encumber the Property or result in any lien on the Property, Seller shall have the sole authority to control the progress of, and to make all decisions with respect to, such proceedings but shall provide Buyer with copies of all communications with the taxing authorities. All net tax refunds and credits which are attributable to any period prior to the Closing which Seller has paid or for which Seller has given a credit to Buyer shall belong to and be the property of Seller. All net tax refunds and credits attributable to any period on the date of and subsequent to the Closing shall belong to and be the property of Buyer. As long the same does not encumber the Property or result in any lien on the Property, Buyer agrees, at no cost or expense to Buyer, to cooperate with Seller in connection with the prosecution of any such proceedings and to take all reasonable steps, whether before or after the Closing, as may be reasonably necessary to carry out the intention of this <u>Subsection 6.7.1.1</u>, including the delivery to Seller, upon demand, of any reasonably necessary books and records, including receipted tax bills and cancelled checks used in payment of such Taxes, the execution of reasonable consents or other documents, and the undertaking of any reasonable acts necessary for the collection of such refund by Seller; and

6.7.1.2.        <u>Operating Expenses</u>. All operating expenses (but excluding all charges under the Contracts which will be Seller's sole responsibility), if any, shall be prorated, and as to each service provider, operating expenses payable or paid to such service provider in respect to the billing period of such service provider in which the Closing occurs (the **"Current Billing Period"**), shall be prorated on a per diem basis based upon the number of days in the Current Billing Period prior to the Closing and the number of days in the Current Billing Period on and after the Closing, and assuming that all charges are incurred uniformly during the Current Billing Period.

6.7.2.    <u>Closing Statement</u>. Prior to the Closing Date, Seller and Escrow Holder shall jointly prepare a closing statement (the **"Closing Statement"**) which shall set forth the costs payable herein and the prorations and credits provided herein and elsewhere in this Agreement.

The prorations and credits set forth in the Closing Statement which is signed by each party and delivered at Closing shall be final.

6.7.3. <u>Items Not Prorated</u>. Seller and Buyer agree that (i) on the Closing, the Property will not be subject to any financing arranged by Seller; (ii) none of the insurance policies relating to the Property will be assigned to Buyer, and Buyer shall responsible for arranging for its own insurance effective immediately after the Closing Date; (iii) utilities, including telephone, electricity, water and gas, shall be read on the Closing Date, and Buyer shall be responsible for all the necessary actions needed to arrange for utilities to be transferred to the name of Buyer immediately after the Closing Date, including the posting of any required deposits, and Seller shall be entitled to recover and retain from the providers of such utilities any refunds or overpayments to the extent applicable to the period prior to the Closing Date, and any utility deposits which it or its predecessors may have posted; and (iv) the Contracts shall not be assumed by Buyer and charges under the Contracts which will be Seller's sole responsibility. Accordingly, there will be no prorations for debt service, insurance or utilities. In the event a meter reading is unavailable for any particular utility, such utility shall be prorated in the manner provided in <u>Section 6.7.1.2</u>.

6.7.4. <u>Indemnification</u>. Buyer and Seller shall each indemnify, protect, defend and hold the other harmless from and against any claim in any way arising from the matters for which the other receives a credit or otherwise assumes responsibility pursuant to this <u>Section 6.7</u>.

6.7.5. <u>Post-Closing Permit Transfer</u>. Seller, at Buyer's sole cost and expense, shall reasonably cooperate with Buyer post-closing to transfer any Permits that could not be transferred at Closing, despite Seller's commercially reasonable efforts to transfer the same at Closing.

6.7.6. <u>Survival</u>. This <u>Section 6.7</u> shall survive the Closing for a period of one (1) year.

7. <u>Representations, Warranties, and Covenants</u>.

7.1 <u>Representations of Seller</u>. Seller represents to Buyer that the facts recited below are true and accurate and that if Seller discovers before the Closing Date that one or more of these facts are untrue or inaccurate, then it will inform Buyer in writing of its discovery before the Closing. Buyer's obligation to consummate this transaction is contingent upon the lack of any material variance in the truth and accuracy of all these facts as of the Closing Date, regardless of whether Seller had no knowledge of the untruth or inaccuracy of representations or warranties made to the best of Seller's knowledge. Any examination or investigation of the Property or of the related operational information by or on behalf of Buyer shall not in any way modify, affect, or diminish the representations and warranties of Seller contained in this Agreement. Seller's representations and warranties shall survive the Closing except to the extent that Seller gives Buyer written notice before the Closing of the untruth or inaccuracy of any representation or warranty, and Buyer nevertheless elects to close this transaction. Seller hereby represents and warrants as of the date hereof and as of the Closing Date to Buyer as follows (which representations and warranties shall expressly survive Closing):

7.1.1.   Subject to receipt of the approval described in <u>Section 10.1.3</u>, Seller has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby.  This Agreement is a legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting the rights of creditors generally, but subject to Seller's obligation to obtain the Bankruptcy Approval as set forth in <u>Section 10.1.3</u> below;

7.1.2.   Seller is not a "foreign person" within the meaning of Section 1445(f) of the Internal Revenue Code of 1986, as amended (the **"Code"**);

7.1.3.   The execution, delivery and performance by Seller of this Agreement, and all other agreements, instruments and documents referred to or contemplated herein or therein do not require the consent, waiver, approval, license or authorization of any person (except as described in <u>Section 10.1.3</u>) or public authority which has not been obtained and do not and will not contravene or violate (with or without the giving of notice or the passage of time or both), the organizational documents of Seller or any judgment, injunction, order, law, rule or regulation applicable to Seller;

7.1.4.   Except as included in the Due Diligence Items, there are no leases or occupying agreements (or any amendments or supplements thereto) encumbering, or in force with respect to, the Property. There are no adverse parties in possession of the Property or of any part thereof and no parties in possession thereof.  No party has been granted any license, lease, or other right relating to the use or possession of the Land or Improvements;

7.1.5.   The Property will be transferred to Buyer free and clear of any management, service or other contractual obligations, including the Contracts. From the date of execution of this Agreement through the date of Closing, Seller will not enter into any oral or written agreements affecting the Property which might become binding on Buyer or the Property at or after Closing and none affect the Property on the Effective Date, other than the Contracts, which will be terminated by Seller and will not encumber the Property as of Closing.

7.1.6.   Seller has not received any actual written notice of any pending or threatened condemnation of all or any portion of the Property;

7.1.7.   Except as set forth in <u>Section 10.1.3</u> of this Agreement, Seller has not received actual written notice of any litigation that is currently pending or threatened with respect to the Property;

7.1.8.   Except as set forth in the Due Diligence Items, Seller has not received any actual written notice from any governmental authority that all or any portion of the Property is presently in material violation of any applicable building codes or any applicable environmental law (relating to clean-up or abatement), zoning law or land use law, or any other applicable local, state or federal law or regulation relating to the Property;

7.1.9.   Seller is not knowingly acting, directly or indirectly for or on behalf of any person, group, entity or nation named by any Executive Order of the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person" or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, or engaging in, instigating or facilitating this transaction for or on behalf of any such person, group, entity or nation; and to Seller's knowledge, Seller is not engaging in this transaction, directly or indirectly in violation of any laws relating to drug trafficking, money laundering or predicate crimes to laundering money;

7.1.10. Seller has, in effect, casualty insurance covering the Property, in amounts sufficient to repair and restore the Property to the condition existing on the Effective Date;

7.1.11. Seller has received no written notice and otherwise has no knowledge of any pending improvement liens or special assessments to be made against the Property by any governmental authority or any tax incentives, rebates or abatements affecting the Property;

7.1.12. Seller has not entered into any outstanding construction contracts regarding the Property.  No work has been performed or is in progress by Seller on the Property, and no materials have been delivered to the Property that might give rise to mechanic's, materialman's, or other liens against all or any part of the Property.

7.1.13. There are no outstanding options, contracts, or other obligations for the sale, exchange, or transfer of all or any part of the Property or the business operated thereon, including, without limitation, any rights of first refusal or rights of first offer.

Whenever the term "to Seller's knowledge" or similar language is used herein with respect to the existence or absence of facts, it signifies that Seller has not undertaken any independent investigation of facts, but instead has based Seller's representation solely upon the current actual knowledge of Keith Smith, Seller's manager (who is the representative of Seller with the best knowledge of the Property, and who assumes no personal liability of any kind by virtue of this Agreement or the Seller representations contained herein unless such individual is intentionally misleads Buyer or such conduct rises to the level of fraud or willful misconduct), and Seller disclaims any obligation to conduct any independent investigation with respect to such matters.

8.1.   Approval of Property; Limitations on Seller Representations and Warranties.

8.1.1.   Except as is specifically provided in this Agreement, Seller makes no representations or warranties as to the truth, accuracy, completeness, methodology of preparation or otherwise concerning any engineering or environmental reports, audits, the materials prepared by Seller or any other materials, data or other information whatsoever supplied to Buyer in connection with Buyer's inspection of the Property; provided that Seller has no actual knowledge of the inaccuracy of such materials or information. It is the parties' express understanding and agreement that such materials are provided only for Buyer's convenience in making its own examination and determination prior to the expiration of the Inspection Period as to whether it wishes to purchase the Property, and, in doing so, except as is specifically provided in this

Agreement , Buyer shall rely exclusively on its own independent investigation and evaluation of every aspect of the Property and not on any materials supplied by Seller. Except as may be specifically provided elsewhere in this Agreement, Buyer expressly disclaims any intent to rely on any such materials provided to it by Seller in connection with its inspection and agrees that it shall rely solely on its own independently developed or verified information. Except with respect to all obligations in this Agreement (including, without limitation, Seller's express representations and warranties in <u>Section 7</u> above) that are expressly stated to survive Closing (collectively, the **"Surviving Obligations"**), except the special warranty of title contained in the Deed, except in the event of a breach of the indemnity contained in <u>Section 24</u> below, except with respect to pro-rations set forth in <u>Section 6.7</u> above, and except in the event of fraud or fraudulent misrepresentation by Seller, Buyer hereby releases Seller and its agents, representatives and employees from any and all claims, demands and causes of action, past, present and future that Buyer may have relating to (i) the condition of the Property at any time, before or after the Closing, including, without limitation, the presence of any hazardous materials; or (ii) any other matter pertaining to the Property. This release shall survive the Closing or the termination of this Agreement.

8.1.2.   In the event of any material breach by Seller of any of the representations or warranties included in this Agreement which is discovered by Buyer prior to Closing, Buyer's sole remedy shall be either: (i) to give written notice to Seller describing such breach and stating that, if Seller is unable to cure the breach within seven (7) days, Buyer may elect in writing to terminate this Agreement whereupon this Agreement shall be canceled and the Deposit shall be paid to Buyer, and Seller shall pay to Buyer within five (5) Business Days for Buyer's Reports pursuant to <u>Section 5.2</u>,   and, thereafter, neither Seller nor Buyer shall have any continuing obligations hereunder except as otherwise expressly set forth herein; or (ii) waive such breach and proceed with the Closing.

8.1.3.   In the event of any material breach by Seller of any of such representations or warranties or any other material breach by Seller of any other provision of this Agreement or any agreement delivered in connection herewith discovered after Closing, Seller shall be liable only for direct and actual damages suffered by Buyer on account of Seller's breach, up to the applicable limits described hereunder, and shall in no event be liable for consequential or punitive damages. Excluding any intentional breaches of Seller or fraud or fraudulent misrepresentation by Seller, and excluding a breach of the special warranty of title contained in the Deed, and excluding a breach of the indemnity contained in <u>Section 24</u> below, and excluding any pro-ration set forth in <u>Section 6.7</u> above, any other liability of Seller hereunder for breach of any such representations or warranties discovered after Closing shall be limited to (a) claims in excess of an aggregate of Ten Thousand No/100 Dollars ($10,000.00) and (b) a maximum aggregate cap of Five Hundred Thousand and No/100 Dollars ($500,000.00). Seller's representations and warranties set forth in <u>Section 7.1</u> and the other Surviving Obligations of Seller, if any, shall survive the Closing for a period of nine (9) months.  Any claim whatsoever against Seller regarding a breach of any such representations or warranties discovered after Closing must be asserted by written notice to Seller and commencement of a legal action, all within two (2) years following Closing, otherwise such claim is forever barred and waived, notwithstanding any longer period that would otherwise be available under any applicable statute of limitations.  In no event shall either party be liable for

any indirect or consequential damages on account of its breach of any representation or warranty contained in this Agreement.

       8.1.4. <u>Approval of Property</u>. The consummation of the purchase and sale of the Property pursuant to this Agreement shall be deemed Buyer's acknowledgement that it has had an adequate opportunity to make such legal, factual and other inspections, inquiries and investigations as it deems necessary, desirable or appropriate with respect to the Property. Except as expressly provided in this Agreement or the Closing documents, Buyer shall not be entitled to and shall not rely upon, Seller or Seller's agents with regard to, and Seller will not make any representation or warranty with respect to: (i) the quality, nature, adequacy or physical condition of the Property including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities or the electrical, mechanical, HVAC, plumbing, sewage or utility systems, facilities or appliances at the Property, if any; (ii) the quality, nature, adequacy or physical condition of soils or the existence of ground water at the Property; (iii) the existence, quality, nature, adequacy or physical condition of any utilities serving the Property; (iv) the development potential of the Property, its habitability or merchantability or the fitness, suitability or adequacy of the Property for any particular purpose; (v) the zoning or other legal status of the Property; (vi) the Property or its operations' compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, conditions or restrictions of any governmental or quasi-governmental entity or of any other person or entity; (vii) the quality of any labor or materials relating in any way to the Property; or (viii) the condition of title to the Property or the nature, status and extent of any right-of-way, lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction or any other matter affecting the Property except as expressly set forth in this Agreement. **EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT OR THE CLOSING DOCUMENTS, SELLER HAS NOT, DOES NOT AND WILL NOT MAKE ANY WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE PROPERTY AND SELLER SPECIFICALLY DISCLAIMS ANY OTHER IMPLIED WARRANTIES OR WARRANTIES ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED TO, ANY WARRANTY OF CONDITION, MERCHANTABILITY, HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE. FURTHERMORE, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT OR THE CLOSING DOCUMENTS, SELLER HAS NOT, DOES NOT AND WILL NOT MAKE ANY REPRESENTATION OR WARRANTY WITH REGARD TO COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS INCLUDING, BUT NOT LIMITED TO, THOSE PERTAINING TO THE HANDLING, GENERATING, TREATING, STORING OR DISPOSING OF ANY HAZARDOUS WASTE OR SUBSTANCE INCLUDING, WITHOUT LIMITATION, ASBESTOS, PCB AND RADON. SUBJECT ONLY TO THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT OR CLOSING DOCUMENTS, BUYER WILL BE ACQUIRING THE PROPERTY "AS IS AND WHERE IS, WITH ALL FAULTS," IN ITS PRESENT STATE AND CONDITION, SUBJECT ONLY TO NORMAL WEAR AND TEAR. BUYER SHALL ALSO ACKNOWLEDGE AND AGREE THAT THERE ARE NO ORAL AGREEMENTS, WARRANTIES OR REPRESENTATIONS COLLATERAL TO OR AFFECTING THE PROPERTY BY SELLER, ANY AGENT OF SELLER OR ANY THIRD PARTY. THE TERMS AND CONDITIONS OF THIS SECTION SHALL**

**SURVIVE THE CLOSING, AND NOT MERGE WITH THE PROVISIONS OF ANY CLOSING DOCUMENTS.**

8.1.5. <u>Release, Limitation of Recourse</u>. Except as expressly set forth in this Agreement to the contrary and except for any claims arising under the express representations, warranties or covenants of Seller under this Agreement or under the indemnity provisions of any document delivered in connection with the Closing, except the special warranty of title contained in the Deed, except in the event of a breach of the indemnity contained in <u>Section 24</u> below, except with respect to pro-rations set forth in <u>Section 6.7</u> above, and except in the event of fraud or fraudulent misrepresentation by Seller Related Parties, Buyer for itself and its agents, affiliates, successors and assigns, hereby releases and forever discharges Seller and any party related to or affiliated with Seller and their respective successors and assigns, including any direct or indirect member of Seller (collectively, the **"Seller Related Parties"**), from and against any and all claims at law or equity which Buyer or any party related to or affiliated with Buyer and their respective successors and assigns (each a **"Buyer Related Party"**), whether known or unknown at the time of this Agreement, which Buyer or a Buyer Related Party has or may have in the future, arising from or related to any matter or thing relating to or in connection with the Property, including but not limited to, the documents and information referred to in this Agreement, any construction defects, errors or omissions in the design or construction and arising out of the physical, environmental, economic or legal condition of the Property, including, without limitation, any claim for indemnification or contribution arising under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. Section 9601, et. seq.) or any similar federal, state or local statute, rule or ordinance relating to liability of property owners or operators for environmental matters.

8.2. <u>Covenants of Seller</u>. Seller hereby covenants as follows:

8.2.1. At all times from the Effective Date through the Closing Date, Seller shall cause to be in force fire and extended coverage insurance upon the Property and public liability insurance with respect to damage or injury to persons or property occurring on the Property in at least such amounts as are maintained by Seller on the Effective Date;

8.2.2. From the Effective Date through the Closing Date, Seller shall not sell, assign or convey any right, title or interest whatsoever in or to the Property, or create or permit to attach any lien, security interest, easement, encumbrance, charge or condition affecting the Property (other than the Permitted Exceptions) without promptly discharging the same prior to Closing;

8.2.3. Except as may be necessary for health and safety, Seller shall not, without Buyer's written approval, (a) amend or waive any right under any Contract such that the same would affect the Property following Closing; or (b) enter into any agreement of any type affecting the Property that is not terminated as of the Closing;

8.2.4. From and after the Effective Date, Seller shall operate the Property in the manner in which Seller has previously operated the Property; provided, however, that Seller shall have no obligation to make any capital improvements; and

8.2.5.  From the Effective Date until the Closing or sooner termination of this Agreement, Seller covenants as follows: (a) Seller shall not place any mortgage or, without prior notice to Buyer, any other encumbrance, easement, covenant, condition, right-of-way or restriction on the Property, amend or modify any such instrument, or voluntarily take any other action that materially and adversely affects title to the Property as same exists on the Effective Date; (b) Seller will give prompt written notice (in no event later than five (5) Business Days after any incident of fire or other casualty) to Buyer of any fire or other casualty affecting the Property after the Effective Date; (c) Seller will deliver to Buyer, promptly after receipt by Seller, a copy of all current written default and other material notices from the service providers under any Contracts and all written notices of any violations issued to Seller by any governmental authority with respect to the Property prior to the Closing Date ("**Existing Violations**") and any other material notices received from any governmental authority with respect to the Property; and (d) Seller shall immediately notify Buyer if Seller receives notice or knowledge of any information that would result in a misrepresentation under Section 8.1 hereof.  If Seller is unable to cure any Existing Violation at or before the Closing, Seller shall have the right, in Seller's sole discretion, in lieu of curing any such Existing Violation but subject to Buyer's reasonable approval, to deposit in escrow with the Title Company at Closing a sum of money sufficient to cure any such Existing Violation and Buyer shall have the right to expend the money so deposited for such purpose.

8.3.    Covenants of Buyer.  In the event Buyer elects to finance this transaction, prior to the expiration of the Inspection Period, Buyer shall make application for the financing, and Buyer shall use its commercial reasonable efforts to prosecute its application for and to obtain such financing.

9.    Representations and Warranties of Buyer.  Buyer hereby represents and warrants to Seller as follows:

9.1.    Buyer has full power and authority to enter into this Agreement, to perform this Agreement and to consummate the transactions contemplated hereby.  This Agreement is a legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to the effect of applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or other similar laws affecting the rights of creditors generally; and

9.2.    The execution, delivery and performance by Buyer of this Agreement, and all other agreements, instruments and documents referred to or contemplated herein or therein do not require the consent, waiver, approval, license or authorization of any person or public authority which has not been obtained and do not and will not contravene or violate (with or without the giving of notice or the passage of time or both), the organizational documents of Buyer or any judgment, injunction, order, law, rule or regulation applicable to Buyer.

10.    Conditions Precedent to Closing.

10.1.    The obligations of Buyer pursuant to this Agreement shall, at the option of Buyer, be subject to the following conditions precedent:

10.1.1. All of the representations, warranties and agreements of Seller set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and as of the Closing Date, and Seller shall not have on or prior to Closing, failed to meet, comply with or perform in any material respect any conditions or agreements on Seller's part as required by the terms of this Agreement;

10.1.2. There shall not exist any material, adverse encumbrance or title defect affecting the Property except for the Permitted Exceptions or matters to be satisfied at Closing; and

10.1.3. Seller shall have obtained, in a form reasonably acceptable to Buyer, the approval of the sale of the Property, as contemplated by this Agreement, from the Bankruptcy Court governing Seller, sufficient for purposes of delivering the Deed and sufficient for purposes of the Title Company issuing the Title Policy, free and clear of any exceptions related to such bankruptcy or any debtor relief laws, including confirmation acceptable to the Title Company that all notices to creditors required under applicable bankruptcy or any debtor relief laws were timely given (the "**Bankruptcy Approval**").  Seller agrees to use commercially reasonable efforts to obtain the Bankruptcy Approval on or before the expiration of the Inspection Period and Seller shall notify Buyer in writing when Bankruptcy Approval is obtained and deliver to Buyer copies of all documentation evidencing the same and pertaining to the same.  If the Bankruptcy Approval is not timely obtained, either Seller or Buyer may terminate this Agreement by delivering written notice of termination (which notice may be sent by email) at any time prior to the expiration of the original Inspection Period.  In the event of such termination, the Due Diligence Items shall be returned to Seller, the Deposit shall be paid to Buyer, and thereafter, neither Seller nor Buyer shall have any continuing obligations hereunder except as otherwise expressly set forth herein.

10.1.4. The Title Company must be unconditionally prepared to issue the Title Policy to Buyer insuring good and indefeasible title to the Land and Improvements subject to no exceptions other than (A) exceptions contained in the Title Report and approved by Buyer before the Closing; and (B) standard printed exceptions and other common exceptions generally included in a Texas Owner Policy of Title Insurance provided that (I) the standard exception for restrictive covenants must either be deleted or reference only restrictions that were contained in the Title Report and approved by Buyer before the Closing; (II) the standard exception for taxes must reflect only taxes for the current year; (III) there must be no exception for "visible and apparent easements," "easements or rights that a survey might show," "public or private roads," "lack of a right of access to and from the land," or the like (except if reference is made to a specific survey and a specific unrecorded exception shown on the survey); (IV) there must be no exception for "rights of parties in possession;" and (V) at Buyer's option, the exception relating to discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions or any overlapping of improvements shall be modified to delete that exception, except as to "shortages in area."  Notwithstanding anything herein to the contrary, there must be no exception relating to bankruptcy proceedings or any debtor relief laws, which shall require, but not be limited to, Seller providing confirmation acceptable to the Title Company that all notices to creditors required under applicable bankruptcy or any debtor relief laws were timely given.  The Title Policy shall additionally include any other endorsements and/or amendments to the Title Policy that are requested by Buyer and that are paid for by Buyer.

10.1.5. On the Closing Date, there must be no litigation, pending or threatened, seeking (A) to enjoin the consummation of the sale and purchase hereunder, (B) to recover title to all or any part of the Property, or any interest therein, (C) to substantially increase ad valorem taxes assessed against the Land and Improvements before or after the Closing, or (D) to enjoin the violation of any law, rule, regulation, restrictive covenant, or zoning ordinance that may be applicable to the Property.

10.2. The obligations of Seller under this Agreement shall, at the option of Seller, be subject to the following condition precedent:

10.2.1. All of the representations, warranties and agreements of Buyer set forth in this Agreement shall be true and correct in all material respects as of the Effective Date and as of the Closing Date, and Buyer shall not have on or prior to Closing, failed to meet, comply with or perform in any material respect any conditions or agreements on Buyer's part as required by the terms of this Agreement.

10.3. If any condition precedent is not fully satisfied by Closing, the party in whose favor the condition runs shall notify the other party and may terminate this Agreement by written notice (in all events such written notice shall be given on or prior to the Closing Date as it may be extended) whereupon this Agreement shall be canceled, the Due Diligence Items shall be returned to Seller, the Deposit shall be paid to Buyer and, thereafter, neither Seller nor Buyer shall have any continuing obligations hereunder except as otherwise expressly set forth herein; provided, however, that if either party notifies the other of a failure to satisfy the conditions precedent set forth in <u>Section 10</u> the party receiving such notice may, within five (5) days of receipt of such notice agree to satisfy the condition by written notice to the other party, and the other party shall thereupon be obligated to close the transaction contemplated hereby provided the party that failed to satisfy the condition so satisfies such condition and such Closing occurs within ten (10) days of the scheduled Closing Date.

11. <u>Damage or Destruction Prior to Closing</u>. Seller bears the risk of all loss or damage to the Property from all causes until the Closing Date. In the event that the Property should be damaged by any Casualty prior to the Closing, Seller shall give prompt written notice to Buyer. If the Property is "materially damaged" (as hereinafter defined) by a fire or other casualty event (a "**Casualty**") prior to Closing, Buyer may elect, in Buyer's sole discretion, terminate this Agreement by written notice given to Seller within ten (10) Business Days after Buyer receives written notice of the occurrence of such Casualty from Seller. If Buyer so terminates this Agreement, then the Deposit shall be returned to Buyer and neither party shall have any further rights or obligations hereunder except as set forth herein. If Buyer does not so terminate this Agreement, or if the Property is not deemed "materially damaged," Buyer will remain bound to purchase the Property for the full Purchase Price pursuant to the terms of this Agreement, without regard to the occurrence or effect of the Casualty; provided that at Closing Seller will assign to Buyer all of Seller's interest in any property and any insurance proceeds relating to the Casualty and credit to Buyer an amount equal to any deductible applicable to Seller's insurance policy related to such casualty claim. For purposes of this Section, the Property shall be deemed "**materially damaged**" if (i) the estimated repair cost is greater than Five Hundred Thousand Dollars ($500,000.00) or (ii) (a) the damage or destruction is not covered by Seller's insurance or

such insurance is not for full replacement cost and (b) the estimated repair cost is greater than Two Hundred Thousand Dollars ($200,000.00).

The provisions of this <u>Section 11</u> and <u>Section 12</u> below shall control, and be effective, notwithstanding the provisions of the Uniform Vendor and Purchaser Risk Act set forth in Section 5.007 of the Texas Property Code.

12.    <u>Eminent Domain</u>.  If, before the Closing, proceedings are commenced, or notice of any condemnation or intent to condemn is given by exercise of the power of eminent domain with respect to all or any portion of the Property ("**Condemnation**") Seller shall give prompt written notice to Buyer.  If the Condemnation, as reasonably determined by Buyer, would render the Property unacceptable to Buyer or unsuitable for Buyer's intended use, as determined by Buyer in Buyer's sole discretion, Buyer shall have the right, by giving written notice to Seller within thirty (30) days after Seller gives notice of the Condemnation to Buyer, to terminate this Agreement, in which event this Agreement shall terminate, the Deposit shall be returned to Buyer, the Due Diligence Items shall be returned to Seller and neither party shall have any further obligation to the other except as expressly provided herein.  If Buyer has the right to terminate this Agreement pursuant to the preceding sentence but Buyer does not exercise such right, then this Agreement shall remain in full force and effect and, at the Closing, the condemnation award (or, if not therefore received, the right to receive such portion of the award) payable on account of the taking shall be transferred to Buyer.  Seller shall give written notice to Buyer within three (3) Business Days after Seller's providing written notice to Buyer of the commencement of any proceedings for the taking by exercise of the power of eminent domain of all or any part of the Property.

13.    <u>Notices</u>.  All notices, demands and other communications of any type given by any party hereunder, whether required by this Agreement or in any way related to the transaction contracted for herein, other than routine communications related to day-to-day business or operational matters, shall be void and of no effect unless given in accordance with the provisions of this <u>Section 13</u>, unless otherwise expressly provided in this Agreement.  All notices shall be in writing and shall be delivered (i) by courier; (ii) by Federal Express or other nationally recognized overnight delivery service; (iii) sent by United States certified mail, return receipt requested, or (iv) by e-mail.  Notices delivered by e-mail must be followed by confirmation via Federal Express or other nationally recognized overnight delivery service or via United States certified mail, return receipt requested.  Notices shall be deemed received (i) if by courier, upon delivery or refusal of same; (ii) if by Federal Express or other nationally recognized overnight delivery service, the Business Day following deposit; (iii) if sent by United States certified mail, return receipt requested, then upon the deposit in a regularly maintained receptacle for United States mail, postage prepaid and (iv) immediately following e-mail transmission.  Any notice received on a non-Business Day or after 5:00 p.m. Central Standard Time, as applicable, on a Business Day shall be deemed received on the next Business Day.  Notices shall be given to the following addresses:

> <u>Seller</u>:              Lone Star Brewery Development, Inc.
>                          c/o Mr. Keith Smith, CEO
>                          1233 W. Loop South, Suite 1170
>                          Houston, Texas 77027
>                          E-mail: Ksmith@parkviewadv.com

|  |  |
|---|---|
| <u>With Required Copies to:</u> | Thomas Rice<br>Pulman, Cappuccio & Pullen, LLP<br>2161 NW Military Hwy, Ste 400<br>San Antonio, TX 78213<br>Telephone: (210) 222-9494<br>E-mail: Trice@pulmanlaw.com |
| <u>Buyer:</u> | GrayStreet Acquisitions<br>c/o GrayStreet Partners<br>4515 San Pedro Avenue<br>San Antonio, Texas 78212<br>Attention: Kevin Covey<br>Email: kevin@graystreet.com |
| <u>With Required Copies to:</u> | Kruger Carson, PLLC<br>711 Navarro Street, Suite 230<br>San Antonio, Texas 78205<br>Attention: Brad Carson<br>Email: brad@krugercarson.com |

Notices or other communications by a party may be furnished by its legal counsel (in-house or outside counsel). The parties shall have the right from time to time to change their respective designees and addresses and may do so by giving at least five (5) days advance written notice to the other party. Any party who fails to keep its information under this Section current with the then name and address of the individuals who are to receive notice or communication on its behalf, shall solely bear the consequences of that failure.

14.    <u>Remedies</u>.

14.1.    <u>Defaults by Seller</u>.  This <u>Section 14.1</u> shall not apply to breaches of representations and warranties, which shall be governed by <u>Section 8.1.2</u> above.  If there is any material default by Seller under this Agreement, following written notice to Seller and seven (7) days, during which period Seller may cure the default, Buyer may, as its sole remedy, elect to either (i) declare this Agreement terminated in which case the Deposit shall be returned to Buyer; or (ii) treat this Agreement as being in full force and effect and bring an action against Seller for specific performance,  however, if specific performance is not an available remedy, Buyer may bring suit, in law or in equity, for damages. Notwithstanding the foregoing, Seller's right to cure shall not be applicable to a failure to close and the Closing shall in no event be extended pursuant to this <u>Section</u>.

14.2.    <u>Defaults by Buyer</u>.  If there is any material default by Buyer under this Agreement, following written notice to Buyer and seven (7) days, during which period Buyer may cure the default, then Seller may, as its sole remedy, declare this Agreement terminated, in which case the Deposit shall be paid to Seller as liquidated damages and not as penalty, in full satisfaction of claims against Buyer hereunder, and each party shall thereupon be relieved of all further obligations and liabilities, except any which survive termination.  Seller and Buyer agree that

Seller's damages resulting from Buyer's default are difficult, if not impossible, to determine, and the above amounts represent a fair estimate of those damages and have been agreed to in an effort to cause the amount of damages to be certain. Notwithstanding the foregoing, Buyer's right to cure shall not be applicable to a failure to close and the Closing shall in no event be extended pursuant to this <u>Section</u>.  In the event this Agreement is terminated due to the default of Buyer hereunder, Buyer shall deliver to Seller, at no cost to Seller, the Due Diligence Items and, if requested in writing by Seller, any or all of Buyer's Reports, subject to reimbursement pursuant to <u>Section 5.2</u>.

15.　　<u>Assignment</u>.  Buyer may assign its rights under this Agreement to any individual and/or entity without Seller's consent; provided, however, that Buyer shall have no such right unless a written assignment is delivered to Seller no later than two (2) days before the Closing Date; and further provided that no such assignment shall relieve Buyer of its obligations hereunder.  In lieu of a formal assignment of this Agreement Buyer shall have the right to take title to the Property at the Closing in a name other than Buyer's name, provided such nominee is wholly-owned by or affiliated with Buyer, GrayStreet Partners or any GrayStreet entity, Caliburn Capital or any related entity, Kevin Covey, or Paul Covey.

16.　　<u>Applicable Law</u>.  This Agreement shall be construed and interpreted in accordance with the laws of the state of Texas, considered without regard to its conflicts of law principles.  Any claims or causes of action relating to this Agreement or its subject matter shall likewise be resolved in accordance with Texas law. Each party, not otherwise subject to the jurisdiction of courts in Texas, hereby submits to the jurisdiction of all applicable courts sitting in Texas and, to the fullest extent permitted by law, waives any objection it may now or hereafter have to Texas courts of proper jurisdiction resolving any such claims or causes of action. Any judicial proceeding involving the parties that is related to this Agreement or its subject matter, including disputes relating to the formation or validity of this Agreement or the enforcement of its provisions, shall be brought exclusively in a court of proper jurisdiction in Bexar County, Texas. Each party voluntarily, knowingly, and irrevocably waives all "forum non conveniens" or similar claims, including claims under Tex. Civ. Prac. & Rem. Code §15.002(b), that a proceeding in Bexar County, Texas would be inappropriate, inconvenient or otherwise improper. Proceedings to enforce a judgement shall not be so limited.

17.　　<u>Interpretation; Construction, Severability</u>. Where required for proper interpretation, words in the singular shall include the plural; the masculine gender shall include the neuter and the feminine, and vice versa.  The terms "successors and assigns" shall include the heirs, administrators, executors, successors, and assigns, as applicable, of any party hereto. Section and other headings in this Agreement are for convenience only and shall not affect the interpretation of this Agreement. The words "include," "includes," and "including" will be deemed to be followed by "without limitation, unless expressly indicated otherwise." Words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. "Herein," "hereof," and words of similar import refer to this Agreement as a whole and not to a particular Section, unless expressly so limited.

The provisions of this Agreement represent the results of discussions and negotiations between the parties, each of whom has had the opportunity to be represented by counsel of its selection. The parties intend that these provisions be interpreted and construed neutrally, in accordance with their

usual and customary meanings. As a result, the parties hereby voluntarily, knowingly, and irrevocably waive any rule of law to the effect that ambiguous or conflicting terms or provisions contained in this Agreement shall be interpreted or construed against the party whose counsel prepared this Agreement or any earlier draft of this Agreement.

If any provision of this Agreement is held to be unenforceable by a court of competent jurisdiction, the holding will be limited to the unenforceable provision and will not affect the validly and enforceability of the remaining provisions of this Agreement. In addition, the holding will be limited to the geographic area of court's jurisdiction and will not render the impacted provision ineffective in other areas. If any provision is determined by a court of competent jurisdiction to be too broad to be legally enforceable, that provision shall be construed to be only so broad as is enforceable.

18.    Amendment.  This Agreement may not be modified or amended, except by an agreement in writing signed by the parties.  The parties may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions and obligations. The exchange of an amendment or waiver may be carried out with counterparts in a pdf format and its execution may be accomplished by the electronic signatures of the parties' duly authorized representatives pursuant to the UETA (as defined below). Any attempt to amend this Agreement or waive its provisions in any other manner shall be void and of no force or effect whatsoever.

19.    Attorney's Fees.  In any legal dispute between the parties related to this Agreement or the subject matter hereof, each party shall be responsible for the payment of its own attorneys' fees and other legal costs until the dispute is finally resolved by court action, settlement, or other means. In the event it becomes necessary for either party to file a suit to enforce this Agreement or any provisions contained herein, the prevailing party shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees, expert fees and costs of court incurred in such suit, including those related to any appeal or review.  The prevailing party or parties shall be those whose position(s) in the outcome of the dispute predominates over the position(s) of the other party or parties. A party's position shall be conclusively deemed to be predominant when: (i) the total monetary award or settlement amount the party is entitled to receive from the opposing party or parties is greater than the total of any award or settlement amount the party is obligated to pay to the opposing party or parties; (ii) the party made a successful effort to enforce the terms of the Agreement (whether injunctive or contractual); or (iii) the party was a defendant and was successful in defending itself against the opposing party's or parties' claims. This Section 19 shall survive Closing.

20.    Entire Agreement; Survival.  This Agreement, including all exhibits, addenda, and other materials that are hereby expressly made a part hereof, and any recitals set forth above, constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No representation, warranty, covenant, agreement or condition not expressed in this Agreement or in any Closing document, if any, shall be binding upon the parties hereto nor shall they affect or be effective to interpret, change or restrict the provisions of this Agreement.  All of the obligations of the parties hereunder and all other provisions of this Agreement shall be deemed to have merged

into the Deed and shall be extinguished at Closing or the earlier termination of this Agreement, except as expressly provided herein.

21.     Multiple Originals; Counterparts; Signatures.  The parties may execute numerous originals of this Agreement. Each such executed Agreement and copies of the same shall have the full force and effect of an original executed instrument.  This Agreement may be executed in any number of counterparts, all of which when taken together shall constitute the entire Agreement.  To facilitate the formation of this Agreement, the parties may execute and exchange by electronic means (pdf document or the like) electronic counterparts of the signature and acknowledgment pages, which shall be deemed original pages for all purposes. Electronic signature and acknowledgment pages may be attached to any counterpart of this Agreement to form a single, consolidated document.

22.     Electronic Transaction. Communications, notices and transactions between the parties related to this Agreement may be carried out by electronic means pursuant to the Uniform Electronic Transactions Act, Tex. Bus. & Comm. Code, §322.001 et seq. or successor statutes ("**UETA**"); subject, however, to the following limitation: this document may not be amended, and its provisions may not be waived, orally or by electronic communications between the parties. Amendments to this document and waivers of its provisions may be effectuated only in the manner authorized by Section 18 of this Agreement.

23.     Time of the Essence; Business Day Convention.  Time is of the essence of this Agreement. Except as provided in Section 6.3, time periods hereunder shall be deemed to expire at 5:00 p.m. Central Standard Time.  If the final date of any period or date of performance falls upon a Saturday, Sunday or legal holiday under Federal law, or the laws of the State in which the Real Property is located ("**Business Day**"), then in such event the expiration date of such period or time of performance shall be extended to the next Business Day.

24.     Real Estate Commission.  Buyer and Seller each represent to the other that no broker's or real estate commissions or other finder's fees, other than a commission payable by Seller to  Jones Lang LaSalle Americas, Inc. (the "**Broker**"), are or shall be due in respect to this transaction by reason of any agreement made or which may be alleged to have been made by Buyer or Seller.  At Closing, Seller shall pay all commissions and fees owed to the Broker pursuant to Seller's separate agreement with the Broker.  Each party agrees to indemnify and hold harmless the other from and against any and all claims, demands or the cost or expense thereof, including reasonable attorney's fees, arising out of any broker's commission, fee or other compensation due or alleged to be due in connection with the transactions contemplated by this Agreement based upon an agreement alleged to have been made or other action alleged to have been taken by the indemnifying party. This Section 24 shall survive Closing.

25.     Parties Not Bound.  Delivery of drafts of this Agreement, and all discussions and written communications regarding drafts of this Agreement, are preliminary discussions only and shall not serve as the basis for any claim of any kind between the parties including any claim of reliance, estoppel, breach of good faith or breach of contract.  Neither party is bound unless and until a fully executed Agreement is delivered by both parties.

26.     Disclosures.

26.1.   <u>District.</u>  If the Property is situated in a utility or other statutorily created district providing water, sewer, drainage, or flood control facilities and services, Chapter 49 of the Texas Water Code requires Seller to deliver and Buyer to sign the statutory notice relating to the tax rate, bonded indebtedness, or standby fee of the district prior to final execution of this Agreement.

26.2.   <u>Title Examination or Policy.</u>  The Buyer should have the Property examined by an attorney of the Buyer's choosing or the Buyer should be furnished with or obtain a title policy.

26.3.   <u>Certificated Service Area of a Utility Service Provider.</u>  If the Property is situated in a certificated service area of a utility service provider, Section 13.257 of the Texas Water Code requires Seller to deliver and the Buyer to sign the required statutory notice.

26.4.   <u>Pipelines.</u> If a transportation pipeline, including a pipeline for the transportation of natural gas, natural gas liquids, synthetic gas, liquefied petroleum gas, petroleum or a petroleum product or hazardous substance, is located on or within the Property, Seller shall give Buyer statutory notice regarding such pipeline(s) as required by Section 5.013 of the Texas Property Code.

26.5.   <u>Public Improvement District</u>.  If the Property is in a public improvement district, Section 5.014 of the Texas Property Code requires Seller to deliver and the Buyer to sign the required statutory notice.

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK;
SIGNATURES TO FOLLOW ON THE NEXT PAGE(S).]

**SIGNATURE PAGE(S) FOR**
**AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY AND ESCROW**
**INSTRUCTIONS**

IN WITNESS WHEREOF, the undersigned Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER:**

Lone Star Brewery Development, Inc.
1233 W. Loop South, Suite 1170
Houston, Texas 77027

By: Keith Smith
Title: Chief Executive Officer

**BUYER:**

GRAYSTREET ACQUISITIONS, LLC,
a Texas limited liability company

By: _____
Name: _____
Title: _____

{00470773}

**SIGNATURE PAGE(S) FOR**
**AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY AND ESCROW**
**INSTRUCTIONS**

IN WITNESS WHEREOF, the undersigned Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER:**

Lone Star Brewery Development, Inc.
1233 W. Loop South, Suite 1170
Houston, Texas 77027

_____

By: Keith Smith
Title: Chief Executive Officer

**<u>BUYER</u>:**

GRAYSTREET ACQUISITIONS, LLC,
a Texas limited liability company

By: _____
Name:   Kevin Covey
Title:   Manager

## CONSENT OF ESCROW HOLDER

Escrow Holder hereby agrees to perform its obligations under this Agreement and acknowledges receipt of a fully executed counterpart of this Agreement on _____, 2020 (the "**Effective Date**").

### <u>CHICAGO TITLE INSURANCE COMPANY</u>

By: _____

Name: _____

Title: _____

# Exhibit A
# Legal Description

Legal description of land:

Tract 1:

Field notes of a 21.575 acre tract of land situated in the City of San Antonio, Bexar County, Texas and being part of Lot 17, New City Block A-17, Lone Star Subdivision, according to plat recorded in Volume 9510, Page 143, Plat Records of Bexar County, Texas, and being part of that 22.39 acre tract conveyed to Newell Nano Family Limited Partnership and described in deed recorded in Volume 15873, Page 1551, Official Public Records of Bexar County, Texas, said 21.575 acre tract being more particularly described by metes and bounds as follows:

Beginning at a 1/2" iron pin set in the south line of Lone Star Blvd. at the northeast corner of Lot 24, New City Block A17, Newell Salvage Subdivision, according to plat recorded in Volume 9632, Page 48, being the northwest corner of this tract;

Thence  S 81° 32' 45" E. 942.92 feet along the south line of Lone Star Blvd. to a railroad spike found at the northwest corner of a tract conveyed to the City of San Antonio by Quit Claim deed recorded in Volume 609, Page 329, being a northeast corner of Lot 17 and this tract;

Thence along the east line of Lot 17, as follows:
 S 03° 01' 41" W. 32.99 feet to a 1/2" iron pin set at an angle point.
 S 34° 41' 42" E. 116.81 feet to a 1/2" iron pin set at the northwest corner of a 0.804 of an acre tract conveyed to the San Antonio River Authority by deed recorded in Volume 14232, Page 652, being a northeast corner of this tract.

Thence along the west line of said 0.804 of an acre tract, as follows:
 S 58° 04' 07" W. 93.35 feet to a 1/2" iron pin with cap found at an angle point.
 S 46° 16' 56" W. 232.75 feet to a 1/2" iron pin with cap found at an angle point.
 S 34° 46' 56" W. 77.05 feet to a 1/2" iron pin with cap found at an angle point.
 S 19° 01' 41" W. 162.62 feet to a 1/2" iron pin with cap found at an angle point.
 S 02° 13' 45" W. 124.70 feet to a 1/2" iron pin with cap found at an angle point.
 S 13° 01' 10" W. 110.93 feet to a 1/2" iron pin with cap found at an angle point.
 S 30° 46' 13" W. 182.96 feet to a 1/2" iron pin with cap found at an angle point.
 S 48° 28' 01" W. 68.11 feet to a 1/2" iron pin with cap found at an angle point.
 S 36° 11' 04" W. 55.45 feet to a 1/2" iron pin set at an angle point.
 S 57° 05' 45" W. 32.31 feet to a 1/2" iron pin with cap found at an angle point. S 69° 54' 21" W. 59.87 feet to a 1/2" iron pin with cap found at an angle point. S 39° 41' 41" W. 43.44 feet to a 1/2" iron pin set in the south line of Lot 17 at the southwest corner of said 0.804 of an  acre tract, being the southeast corner of this tract;

Thence N  86° 15' 22" W. 518.54 feet along the south line of Lot 17, being the north line of the San Antonio Public Service Company  property, to a 1/2" iron pin set at the southeast corner of Lot 24, being the southwest corner of this tract;

Thence  along the east line of Lot 24, as follows:
 N 08° 25' 52" E. 401.61 feet to a 1/2" iron pin found at an angle point.
 N 08° 38' 13" E. 824.41 feet to the place of Beginning and containing 21.575 acres of land according to a survey made on the ground.

Tract 2:

Lot 24, New City Block A-17, Newell Salvage Subdivision, an Addition in Bexar County, Texas, according to map or plat thereof, recorded in Volume 9632, Page 47-48, Deed and Plat Records, Bexar County, Texas.

## Exhibit B
## Due Diligence Items

(1)    The current title insurance policy and any previous title policies' commitments and exception documents referred to therein;

(2)     "As-built" and any other plans and specifications for the Property;

(3)    Any reports, surveys, assessments or other information relating to soil and subsurface conditions in respect to the Property;

(4)    Any existing surveys of the Property;

(5)    Copies of all leases and contracts (maintenance, security, property management, warranties, etc.) affecting the Property and any amendments thereto, if any;

(6)    Copies of 2017, 2018, and 2019 tax bills and 2020 estimates;

(7)    Copies of all soils reports; feasibility studies; engineering studies, financial reports, environmental reports, studies, assessments, and notices and any other reports in Seller's possession or control, including, copies of any Phase I environmental assessment report and any other reports, assessments and surveys relating the environmental condition of the Property;

(8)    Copies of any asbestos encapsulation contracts, process and the certificate completion;

(9)    Copies of any contracts for the roof replacement repairs and certification of completion thereof; and

(10)   An itemized schedule of all Personalty.

(11)   Any documentation regarding water, sanitary sewer, gas and other utilities serving the Property; utility information pertaining to the Property;

(12)   Copies of all existing insurance policies affecting any of the Improvements or the Personalty;

(13)   A written description of all oral agreements with third parties, if any, affecting the Land, Improvements, and Personalty or the operation thereof;

(14)   Copies of tax statements and paid tax receipts and of utility bills and paid utility receipts for the immediately preceding calendar year, and the tax statement and the utility bills and paid utility receipts for the current year, to the extent available to Seller;

(15)   Copies of certificate(s) of occupancy and all other certificates, permits and governmental licenses or approvals relating to the Property or the operation thereof, to the extent available to Seller; and

(16)     Copies of all documentation pertaining to the bankruptcy affecting the Property.

**Exhibit C**
**Special Warranty Deed**

**NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

THE STATE OF TEXAS　　　　　　§
　　　　　　　　　　　　　　　§
COUNTY OF _____　　　　　　§　　　　KNOW ALL PERSONS BY THESE PRESENTS:

That _____, a _____ ("*Grantor*"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable consideration to the undersigned paid by _____, a _____ ("*Grantee*"), whose address is _____, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, BARGAINED, SOLD, AND CONVEYED, and by these presents does GRANT, BARGAIN, SELL, AND CONVEY unto Grantee, the tract of land located in _____ County, ____, described in **Exhibit A** attached hereto and made a part hereof, together with all improvements thereon (the "*Property*"), and all rights, privileges, appurtenances, easements, and hereditaments owned by Grantor and located thereon or pertaining thereto, including all rights, title, and interest of Grantor in and to all easements, adjacent streets, alleys, strips, gores, or rights-of-way pertaining thereto, and subject to the matters set forth on **Exhibit B** attached hereto and made a part hereof, but only to the extent the same are valid and subsisting and affect the Property (the "*Permitted Exceptions*").

Grantor hereby assigns and transfers to Grantee all claims and causes of action arising from or related to any Environmental Injury or other injury to the Property that may have occurred or originated prior to the date of this instrument.  "*Environmental Injury*" means any injury, damage, or loss in value to the Property arising from or related to any spill, leak, or release of any substance that is defined or listed as a hazardous, toxic, or dangerous substance under any existing federal, state, county, or municipal law, ordinance, code, regulation, standard, or guideline in any way relating to or regulating human health or safety or industrial hygiene or environmental conditions or pollution or contamination.  Grantor makes no representations or warranties of any nature to Grantee as to the existence or viability of any such claims or causes of action.

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in anywise belonging unto Grantee and its successors and assigns forever, subject to the Permitted Exceptions; and Grantor does hereby bind itself and its successors and assigns to WARRANT AND FOREVER DEFEND all and singular the Property unto Grantee and Grantee's successors and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under Grantor, but not otherwise, subject to the Permitted Exceptions.

{00470773}

Grantee hereby assumes and agrees to pay all taxes affecting the Property for the year 2020 and subsequent years.

As a material part of the consideration for this sale, Grantor and Grantee agree that Grantee is taking the Property "AS IS, WHERE IS" and that there are no representations, disclosures, or express or implied warranties, except those contained in the purchase contract by and between Grantor and Grantee for the purchase and sale of the Property (the "Contract"). Grantee has not relied on any information, other than Grantee's inspection and the representations and warranties expressly contained in the Contract.

*[**Signature Page Follows**]*

IN WITNESS WHEREOF, this Special Warranty Deed has been executed by Grantor on the date set forth below, to be effective as of the ___ day of _____, 20_____.

### GRANTOR:

_____,
a _____

By: _____
Name: _____
Title: _____
Date: _____

### EXHIBIT ONLY. DO NOT EXECUTE.

THE STATE OF _____          §
                                    §
COUNTY OF _____          §

This instrument was acknowledged before me on this _____ day of _____, 20____, by _____, _____ of _____, a _____, on behalf of said _____.

_____
NOTARY PUBLIC in and for the
State of _____

[Seal]

**Exhibit A – Description of the Property**
**Exhibit B - Permitted Exceptions**

**Exhibit D**
**Non-Foreign Affidavit**

**NON-FOREIGN AFFIDAVIT**

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____ ("***Transferor***"), the undersigned hereby certifies the following on behalf of the Transferor.

1.  Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign estate, or foreign person (as those terms are defined in the Internal Revenue Code and the Income Tax Regulations promulgated thereunder);

2.  Transferor is not a disregarded entity as defined in § 1.1445-2(b)(2)(iii);

3.  Transferor's U.S. employer identification number is _____; and

4.  Transferor's address is:

    _____

    _____

Transferor understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury the undersigned declares that it has examined this certification and to the best of its knowledge and belief it is true, correct and complete, and it further declares that it has authority to sign this document on behalf of Transferor.

*[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

_____,

a _____

By: _____

Name: _____

Title: _____

Date:_____

**EXHIBIT ONLY. DO NOT EXECUTE.**

THE STATE OF _____     §
                              §
COUNTY OF _____      §

    This instrument was acknowledged before me on this _____ day of _____, 20_____, by _____, _____ of _____, a _____, on behalf of said _____.

_____

NOTARY PUBLIC in and for the
State of _____

[Seal]

## Exhibit E
## Bill of Sale and Assignment and Assumption

### BILL OF SALE, ASSIGNMENT, AND ASSUMPTION AGREEMENT

This **BILL OF SALE, ASSIGNMENT, AND ASSUMPTION AGREEMENT** (this "***Bill of Sale***") is made and entered into as of the ___ day of _____, 20___, by and between _____, a _____ ("***Assignor***"), and _____, a _____ ("***Assignee***").

### AGREEMENTS

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      Assignor hereby SELLS, TRANSFERS, ASSIGNS, and CONVEYS to Assignee the following (collectively, the "***Assigned Property***"):

     (a)      All fixtures, appliances, equipment, and other personal property of whatever kind or character owned by Assignor and attached to or installed on or in the real property located in _____ County, _____ (as more particularly described in the attached **Exhibit A**, the "***Land***") or the improvements located on the Land ("***Improvements***") (collectively, the "***Personal Property***").

     (b)      All of Assignor's right, title, and interest, if any, in and to all warranties, guaranties, and bonds used in connection with and/or related to the maintenance, repair, or operation of the Land or the Improvements (or any part thereof), but only to the extent that the foregoing are assignable by Assignor without any necessary third-party consent or to the extent that all necessary third-party consents to the assignments have been obtained.

2.      Subject to the matters set forth herein, Assignor hereby binds itself and its successors and assigns to FOREVER WARRANT and DEFEND title to the Personal Property unto Assignee and Assignee's successors and assigns against every person whomsoever lawfully claiming the same or any part thereof by, through, or under Assignor, but not otherwise.

3.      Assignee hereby accepts the assignment of the Assigned Property and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations thereunder from and after the date hereof.  Assignee agrees to indemnify and hold harmless Assignor from any cost, liability, damage, or expense (including attorneys' fees) arising out of or relating to Assignee's failure to perform any of the obligations relating to the Assigned Property, to the extent accruing on or after the date hereof.  Assignor agrees to indemnify and hold harmless Assignee from any cost, liability, damage, or expense (including attorneys' fees) arising out of or relating to Assignor's failure to perform any of the obligations relating to the Assigned Property, to the extent accruing before the date hereof.

4.      This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

5.      As a material part of the consideration for this sale, Assignor and Assignee agree that Assignee is taking the Assigned Property "AS IS, WHERE IS" and that there are no representations, disclosures, or express or implied warranties, except those contained in the purchase contract by and between Assignor and Assignee for the purchase and sale of the Land (the "Contract"). Assignee has not relied on any information, other than Assignee's inspection and the representations and warranties expressly contained in the Contract.

[*Signature Page Follows*]

IN WITNESS WHEREOF, this Bill of Sale is executed on the dates set forth below to be effective as of the date first above written.

**ASSIGNOR:**

_____,

a _____

By: _____

Name: _____

Title: _____

Date: _____

**EXHIBIT ONLY. DO NOT EXECUTE.**

**ASSIGNEE:**

_____,

a _____

By: _____

Name: _____

Title: _____

Date: _____

**EXHIBIT ONLY. DO NOT EXECUTE.**

# EXHIBIT 2

{EXHIBIT Letters}

### FIRST AMENDMENT TO
### AGREEMENT FOR PURCHASE AND SALE
### OF REAL PROPERTY AND ESCROW INSTRUCTIONS

This FIRST AMENDMENT TO AGREEMENT FOR PURCHASE AND SALE OF REAL PROPERTY AND ESCROW INSTRUCTIONS ("**Amendment**") is made and entered into by and between Lone Star Brewery Development, Inc. ("**Seller**"), and GrayStreet Acquisitions, LLC, a Texas limited liability company and/or assigns ("**Buyer**").

For and in consideration of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller and Buyer hereby recite and agree as follows:

1.    **Recitals**.

(a)    **Agreement for Purchase and Sale of Real Property and Escrow Instructions**. Seller and Buyer entered into that certain Agreement for Purchase and Sale of Real Property and Escrow Instructions, dated effective April 27, 2020 (the "**Contract**"), pursuant to which Seller agreed to sell and Buyer agreed to purchase, pursuant to the terms, provisions and conditions therein, certain property real property consisting of approximately thirty-two (32) acres of land and a complex of historic structures formerly housing the Lone Star Brewery just south of downtown San Antonio, Texas, as more particularly described in the Contract. All capitalized terms not otherwise defined herein will have the meaning ascribed to them in the Contract.

(b)    **Amendment**. Seller and Buyer desire to amend the Contract pursuant to this Amendment as hereinafter provided.

2.    **Purchase Price**. Notwithstanding anything in the Contract to the contrary, the Purchase Price for the Property shall be Fourteen Million Four Hundred Fifty Thousand and No/100 Dollars ($14,450,000.00).

3.    **Closing Date**. Notwithstanding anything in the Contract to the contrary, the Closing Date shall be May 1, 2020.

4.    **Title Company**. Notwithstanding anything in the Contract to the contrary, the parties hereby agree to that all references in the Contract to "Escrow Holder" and "Title Company" are hereby changed from "*Chicago Title Insurance Company, Attn: Douglas W. Becker, 15727 Anthem Parkway, Suite 210, San Antonio, Tx, 78249*", to "*Charter Title Company, 800 Town & Country Blvd., Suite 210, Houston, Texas 77024, Attn: Leslie Mann*". The Deposit previously deposited with Chicago Title Insurance Company shall be transferred to Charter Title Company concurrent with the effective date of this Amendment.

5.    **Other Terms**. All other terms, conditions and provisions of the Contract are hereby ratified and confirmed and will remain in full force and effect as of the date thereof, except as expressly modified hereby.

6.    **Counterparts**. This Amendment may be executed by facsimile transmission in two or more counterparts, each of which will be deemed to be an original, but all of which taken together will constitute but one and the same instrument.

7.    **Binding Effect**. This Amendment will be binding upon and inure to the benefit of the Seller and Buyer and their respective successors and assigns.

1

EXECUTED to be effective the 29th day of April, 2020.

SELLER:                    LONE STAR BREWERY DEVELOPMENT, INC.

                           By: _____
                           Name:  Keith Smith
                           Title: Chief Executive Officer


BUYER:                     GRAYSTREET ACQUISITIONS, LLC,
                           a Texas limited liability company

                           By: _____
                           Name:  Kevin P. Covey
                           Title:  Manager

2